In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-3276

CORDELL SANDERS,

*Plaintiff-Appellant,*

*v.*

MICHAEL MELVIN, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 16-cv-1366 — **Jonathan E. Hawley**, *Magistrate Judge.*

_____

ARGUED NOVEMBER 3, 2021 — DECIDED FEBRUARY 1, 2022

_____

Before KANNE, BRENNAN, and KIRSCH, *Circuit Judges.*

KANNE, *Circuit Judge.* Cordell Sanders has "three strikes" under the Prison Litigation Reform Act ("PLRA"). That means he cannot bring a lawsuit in federal court without prepaying the filing fee unless he plausibly pleads that he is in imminent danger of serious physical injury. He did just that, indicating his belief that certain practices at the Pontiac Correctional Center, where he was housed in solitary confinement, would lead him to self-harm.

The district court found that this allegation was a lie designed to allow Sanders to sneak around the three-strikes rule and dismissed his entire suit as a sanction for misconduct. It did so without explicitly considering whether lesser sanctions would be appropriate instead.

Because we conclude that the district court's finding of fraud was clearly erroneous, and its failure to consider lesser sanctions was an abuse of discretion, we reverse.

## I. BACKGROUND

### A. Factual Background

Sanders, a severely mentally ill inmate, has been in the custody of the Illinois Department of Corrections ("IDOC") since 2004. For eight of those years, he was held in solitary confinement. When he was sixteen years old, he was diagnosed with intermittent explosive disorder, an impulse control disorder, and depressive disorder. Since then, his diagnoses have expanded to include, among others, schizoaffective disorder and post-traumatic stress disorder. His mental health has deteriorated during his time in solitary confinement.

Sanders has even attempted suicide, or otherwise engaged in self-harm, on multiple occasions. One time Sanders overdosed on Motrin; another time he bit flesh out of his wrist. He alleges in his original and first amended complaints that the prison "require[s] … inmates to self mutilate, overdose on pills, hang themselves, [and] fals[e]ly declare to be suicidal in order to speak with them about non-suicidal issues." More than once, Sanders alleges, he has been told that his concerns do not warrant attention unless he is in crisis.

For example, Sanders claims that one time in October 2015, after he expressed to a prison guard that he needed to speak with someone about his depression, "[t]he prison guard came back and told [him] that [Qualified Mental Health Professional Andrea] Moss stated that if [he] was n[o]t suicidal, no one wants to see him right now." Soon after that discussion, Sanders overdosed on Motrin.

Another time, he claims he saw Dr. Daidra Marano in the prison infirmary. He alleges that, in response to his assertion that he thought he had to declare he was suicidal in order to speak to a member of the mental health staff, Dr. Marano allegedly said, "that[']s what it seems like."

In July 2016, Sanders alleges he experienced a replay of the first event recounted above. He told a guard that he needed to speak to a social worker about an issue unrelated to suicide, and the guard left to consult Moss and returned saying that no one wanted to see him unless he was suicidal.

At one point, he alleges that he took Moss up on her proposition. After "fals[e]ly" declaring that he was suicidal, he was taken to Moss, who allowed him to speak with a social worker about an issue unrelated to suicide.

This pattern led Sanders to declare that "if the aforementioned mental health people in this count[y] continue with the self mutilation policy as a pre-condition to speak with a mental health person, he will eventually succeed in commit[t]ing suicide."

In his original complaint, Sanders described his mental health needs in detail. Below are some relevant portions of the complaint:

19. Defendants Andrea Moss, Dr. Marano, Kelly Haag, Todd Nelson, Linda Duckworth, Stephan Lanterman, have deliberately failed to devise the plaintiff a personalized treatment plan conducive to improving his mental illnesses in spite of his numerous requests on numerous occasions which has contributed to the Plaintiff's attempted suicide on October 27, 2015, [and] July 24th 2016 by swallowing dangerous amounts of motrin and other medications, self mutilation by way of biting flesh out of his wrist on July 27, 2016 while on suicide watch status which was made possible due to the non-mental health prison guards failure to adequately monitor inmates on suicide watch.

….

20. Since May 27, 2016, Plaintiff hasn[']t been given psychotherapy that he needs on a fixed basis [which] has contributed to his suicide attempts.

….

21. Plaintiff has informed defendants that the isolating stressful conditions of disciplinary isolation has exacerbated his [mental illnesses] … and ha[s] repeatedly requested his release from disciplinary isolation and to be house[d] in a mental health setting which the defendants have failed to do which contributes to Plaintiff's suicide attempts.

….

27. Plaintiff reasonably foresee[s] that if defendants don[']t remove him from disciplinary isolation and into a mental health setting, and don[']t construct Plaintiff a personal mental health treatment plan at improving his mental health diagnosis, and if

defendants continue to … refuse to interview the Plaintiff on a weekly basis, that it will lead to more suicide attempts and or actual suicide, including defendants refusal to provide the Plaintiff with individual and or group psychotherapy, specialized psycho-educational groups, etc.

*B. Procedural History*

Sanders filed his original *pro se* complaint in September of 2016. The defendants still in the suit are Michael Melvin, Andrea Moss, Dr. Daidra Marano, Kelly Haag, Todd Nelson, Anthony Wills, Linda Duckworth, Stephan Lanterman, Teri Kennedy, Wexford Health Sources, Inc., and Rob Jeffreys (collectively, "the Defendants"). Melvin, Marano, Wills, Kennedy, and Jeffreys are referred to as the "IDOC Defendants," while Moss, Lanterman, Haag, Nelson, Duckworth, and Wexford are referred to as the "Wexford Defendants."

On the same day he filed the complaint, Sanders applied to proceed *in forma pauperis* ("IFP"), which is a status that allows indigent prisoners to bring suits without prepaying the usual filing fee. There are some limits on who can proceed IFP. *See* 28 U.S.C. § 1915(g). A prisoner who has three strikes—actions or appeals dismissed for being "frivolous, malicious, or fail[ing] to state a claim"—can only proceed without prepayment if he is "under imminent danger of serious physical injury." *Id.* Sanders is one such litigant, and he indicated as much in his application, noting that he was seeking IFP status under the "imminent danger exception."

The district court initially granted his application to proceed IFP, but after a merit review the court revoked its grant, finding that none of Sanders's allegations demonstrated that he was in imminent danger.

Sanders subsequently obtained representation and appealed to this court, and we vacated the revocation, restoring his IFP status. We determined that only one of Sanders's contentions sufficed to allege he is in imminent danger of serious physical harm:

> But Sanders advances a stronger contention: that his mental condition … disposes him to self-harm. He asserts that he has twice tried to commit suicide and at least once engaged in self-mutilation. According to his complaint, the mental-health staff at Pontiac ignores the problems of inmates in solitary confinement unless they engage in self-harm. … That Sanders has attempted self-harm multiple times lends support to his allegation that a future attempt is "imminent" unless he is released from solitary or allowed mental-health care. Courts don't accept allegations of danger uncritically. But Sanders's history, coupled with the prison's diagnosis of his condition, makes his allegations plausible. And plausibility is enough in a pleading.
>
> …
>
> When the prospect of self-harm is a consequence of the condition that prompted the suit, a court should treat the allegation (if true) as imminent physical injury. And this is the kind of allegation Sanders has advanced. He contends that solitary confinement not only is injurious by itself but also causes prisoners to lose the benefit of mental-health care, and that only self-mutilation (or a credible threat of self-mutilation) restores that care.

*Sanders v. Melvin*, 873 F.3d 957, 960–61 (7th Cir. 2017) (citations omitted).

Although we allowed Sanders to proceed IFP, we did so with a caveat: "If Sanders's allegations of imminent physical harm are untrue, then he must pay the whole filing fee promptly. … And if it turns out that Sanders has lied in an effort to manipulate the judge, the case may be dismissed with prejudice as a sanction even if he comes up with the $400." *Id.* at 961 (citations omitted) (citing *Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 306–07 (7th Cir. 2002); *Ammons v. Gerlinger*, 547 F.3d 724, 725–26 (7th Cir. 2008)). We then remanded the suit.

On remand, now represented by counsel, Sanders paid the filing fee, terminating his IFP status. He then filed an amended complaint, adding several claims. Over the next fourteen months, there was a flurry of action in the district court, but none of that action is relevant to this appeal.

However, two motions filed after that period are relevant. First, the Wexford Defendants filed a motion for summary judgment in February of 2020. Sanders responded in opposition, and those defendants replied. Second, and more important, the IDOC Defendants filed a motion for sanctions.[1]

The motion for sanctions contended that Sanders's entire suit should be dismissed with prejudice because he lied to obtain IFP status. The district court agreed, finding that "100 pages of mental health progress notes … would appear to refute [his] claim that he only received mental health treatment when he harmed himself or credibly threatened self-harm." It concluded that this discrepancy

---

[1] Really, they filed two motions for sanctions, but the first motion was withdrawn because it did not comply with the notice requirements of Rule 11.

> represent[ed] far more than inaccuracy. Plaintiff, a prolific litigator, was aware that he could not proceed IFP absent allegations of imminent danger of serious physical harm. It appears that Plaintiff made such unsupported allegations so as to circumvent the 3-strikes rule, and reiterated that claim in his amended complaint. In so doing, he lied in his pleadings.

Based on the IDOC Defendants' motion for sanctions, the district court dismissed Sanders's suit with prejudice pursuant to its inherent authority to punish fraud on the court.

Sanders now appeals the dismissal.

## II. ANALYSIS

We review the district court's finding of fraud for clear error, and its dismissal with prejudice of Sanders's claims for an abuse of discretion. *Thomas*, 288 F.3d at 308.

Sanders argues that the district court lacked a sufficient factual or legal basis for finding fraud; that even if it did have such a basis, dismissal with prejudice was improper; and that the district court abused its discretion by imposing sanctions without holding an evidentiary hearing. We begin with a review of the law surrounding the district court's inherent authority to sanction a party for fraud on the court before turning to the factual question at the heart of this appeal: did Sanders lie to circumvent the three-strikes rule?

*A. Inherent Authority to Sanction Fraud*

"It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the

exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (alteration in original) (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)).

"For this reason, 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.'" *Id.* (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 227 (1821)). But implied powers, "[b]ecause of their very potency, … must be exercised with restraint and discretion." *Id.* at 44 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)).

Among these powers is the ability of "a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court." *Id.* (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944); *Universal Oil Prods. Co. v. Root Refin. Co.*, 328 U.S. 575, 580 (1946)).

And if fraud is discovered prior to judgment, a court "may impose appropriate sanctions to penalize and discourage misconduct." *Ramirez v. T & H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016). Dismissal may even "be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false." *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015).

More specifically, "we have held that a dismissal with prejudice is an appropriate sanction for lying to the court in order to receive a benefit from it, because no one needs to be warned not to lie to the judiciary." *Ayoubi v. Dart*, 640 F. App'x 524, 528–29 (7th Cir. 2016) (unpublished) (citing *Mathis v. N.Y. Life Ins. Co.*, 133 F.3d 546, 547 (7th Cir. 1998)).

To put an even finer point on it, "[w]e have approved that sanction when a litigant has lied to receive the benefit of proceeding [IFP], observing that fines would be an ineffective sanction against an indigent plaintiff." *Id.* at 529 (citing *Hoskins v. Dart*, 633 F.3d 541, 543–44 (7th Cir. 2011); *Thomas*, 288 F.3d at 308). *But see Ebmeyer v. Brock*, 11 F.4th 537, 547 (7th Cir. 2021) ("For a *pro se* prisoner proceeding [IFP], a verbal or written warning, or a modest monetary sanction may have a sufficient effect." (citing *Evans v. Griffin*, 932 F.3d 1043, 1048 (7th Cir. 2019))).

Before we discuss the district court's finding of fraud, we want to clear something up to focus the inquiry. We have already established that dismissal with prejudice is an appropriate sanction for lying to obtain IFP status. Here, that purported lie occurred in Sanders's original complaint, so we will look to that filing.

Although Sanders subsequently amended his complaint and paid the filing fee, that does not cure any lie made to obtain IFP status, if one was made, because "courts generally have an interest in both punishing a party's dishonesty and deterring others who might consider similar misconduct." *Secrease*, 800 F.3d at 402.

If, after a court catches him in a critical lie, a party were permitted to continue with his case upon the payment of $400, then he would suffer almost no consequence for his attempt to subvert the court's authority, and others would not be deterred.

But at the same time, the amended complaint cannot reasonably be said to contain the same "fraud on the court" found in the original because there was no benefit that the

"lie" would further Sanders in obtaining. At that point, his IFP status had been vitiated by payment of the fee.

In other words, the lie would not be material. *Cf. Greyer v. Ill. Dep't of Corr.*, 933 F.3d 871, 879–80 (7th Cir. 2019) ("Nonetheless, [district courts] should proceed carefully before imposing severe sanctions on prison litigants who omit portions of their litigation histories, if those omissions do not add strikes and thus have no bearing on the prisoner's ability to proceed under the PLRA."). Therefore, our inquiry will exclusively look at allegations in the original complaint.

*B. The Fraud*

Critical to the fraud question is what Sanders pled in his original complaint. The district court found that he "plainly pled that he was not provided mental health care unless he harmed himself." Sanders contends that he pled "that he did not receive mental health care adequate to his serious needs … and that he was told on at least two occasions that [he] would have to be suicidal in order to see a mental health provider." Appellant's Br. at 29.

This is important because the record clearly reflects that Sanders was seen many times by the mental health staff. If we accept the district court's characterization, then the "100 pages of mental health progress notes" documenting "that he was seen 44 times" between 2015 and 2016 make it "demonstrably clear that self-harm was not a prerequisite to [Sanders] receiving mental health treatment." This conclusion would seem to justify dismissal with prejudice. *See Ayoubi*, 640 F. App'x at 526–27 (dismissal with prejudice proper where authenticated dated prison library logs refuted plaintiff's claim

that jail officials had "totally disregarded" the court's request that he be given reasonable access).

If we accept Sanders's characterization, on the other hand, then it's possible his allegation is true, or at the very least inaccurate but not made "with a degree of culpability that exceeds simple inadvertence or mistake" and constitutes a "willfull[] abuse[] [of] the judicial process" or otherwise indicates bad faith. *Ebmeyer*, 11 F.4th at 546 (quoting *Ramirez*, 845 F.3d at 776, 778). In the latter situation, he would simply be required to pay the filing fee—something he has already done—to avoid dismissal. *Melvin*, 873 F.3d at 961 (citing *Taylor v. Watkins*, 623 F.3d 483, 486 (7th Cir. 2010)).

The complaint itself contains competing indications that each party is correct. Supporting the district court's characterization are at least two isolated statements:

- "Defendants … require the Plaintiff and other inmates to self mutilate, overdose on pills, hang themselves, [or] fals[e]ly declare to be suicidal in order to speak with them about non-suicidal issues."

- "Plaintiff reasonably foresee[s] that if the aforementioned mental health people in this count[y] continue with the self mutilation policy as a pre-condition to speak with a mental health person, he will eventually succeed in commit[t]ing suicide."

Other parts of the complaint suggest that Sanders's allegations were more nuanced. He alleged specific inadequacies in his care that he feared would lead to him taking his own life:

- "Defendants … have deliberately failed to devise the plaintiff a personalized treatment plan conducive to improving his mental illnesses in spite of his numerous

requests … which has contributed to the plaintiff's attempted suicide … ."

- "Plaintiff hasn[']t been given psychotherapy that he needs on a fixed basis [which] has contributed to his suicide attempts."

- "Plaintiff has … repeatedly requested his release from disciplinary isolation and to be house[d] in a mental health setting which the defendants have failed to do which contributes to Plaintiff's suicide attempts."

- "Plaintiff reasonably foresee[s] that if defendants don[']t remove him from disciplinary isolation and into a mental health setting, and don[']t construct plaintiff a personal mental health treatment plan … and if defendants continue to … refuse to interview the Plaintiff on a weekly basis, that it will lead to more suicide attempts and or actual suicide, including defendants refusal to provide the Plaintiff with individual and or group psychotherapy, specialized psycho-educational groups, etc."

In an ordinary case, the deference accorded under clear error review might be strong enough for us to affirm the district court's factual determination of fraud. That is, we might say that because "there are two permissible views of the evidence, the trial court's choice between them cannot be clearly erroneous." *Goodvine v. Carr*, 761 F. App'x 598, 601 (7th Cir. 2019) (unpublished) (quoting *Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 448 (7th Cir. 2006)). But this is not an ordinary case. It is a suit brought *pro se* by a prisoner, and we must be more lenient in our approach.

The Supreme Court has noted that "[i]t is settled law that the allegations" in a *pro se* prisoner "complaint, 'however inartfully pleaded' are held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). In the 12(b)(6) context, this means that "[s]uch a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

We have also acknowledged that "[i]t is the recognized duty of the trial court to insure that the claims of a *pro se* [litigant] are given a 'fair and meaningful consideration,'" *Schilling v. Walworth Cnty. Park & Plan. Comm'n*, 805 F.2d 272, 277 (7th Cir. 1986) (alteration in original) (quoting *Childs v. Duckworth*, 705 F.2d 915, 922 (7th Cir. 1983)), because "[t]he accessibility of the courts to those who cannot afford counsel is too important a value to be sacrificed for the needless exaction of harsh penalties for isolated and minor mistakes," *id.*

Moreover, "[a] litigant who appears *pro se* should not be treated more harshly for negligent errors than one represented by an attorney. Otherwise, only those wealthy enough to be able to afford an attorney would be able to insulate themselves from the consequences of an occasional human error … ." *Id.* at 277 n.8 (citation omitted).

In similar cases that have come before us, we have employed this concern. In *Greyer v. Illinois Department of Corrections*, a *pro se* prisoner attempting to proceed IFP with his § 1983 suit against prison officials failed to list two prior suits under the litigation-history portion of his form complaint. 933 F.3d at 875–76. We said that "[w]hen viewed in the liberal

light in which we must take *pro se* pleadings, Greyer's explanation for his failures is plain: his mental health issues and illiteracy created a situation in which he did not fully understand what was being asked of him, and thus the omissions were inadvertent." *Id.* at 878 (citation omitted). With respect to one of the omitted suits, we added, "Understandably, someone with no legal training might not draw the conclusion that he must include his habeas corpus petition on a list of cases 'relating to [his] imprisonment.'" *Id.* (alteration in original). We thus concluded that the district court's factual findings about intent were unsupported. *Id.* at 879.

In *Ebmeyer v. Brock*, another *pro se* prisoner brought a § 1983 suit alleging that a team of officers in his prison "subjected him to a humiliating, unconstitutional strip search and excessive force." 11 F.4th at 540. The prisoner alleged that "an unidentified 'John Doe' member of that team placed him in extremely tight handcuffs that caused him injuries." *Id.* Later, after the court expended a considerable amount of effort to help him identify the John Doe, it learned that Ebmeyer had known his first name since the beginning of the suit. *Id.* It dismissed his suit with prejudice for failing to disclose this fact sooner and rejected his explanation. *Id.* at 540–41. We vacated the judgment in part, finding that, with respect to intent, "Ebmeyer's conduct [was] plausibly the result of misunderstanding, inadvertence or mistake as opposed to an indication of bad faith or a willful abuse of the judicial process." *Id.* at 547.

Returning to the case before us, we believe that the district court's finding of fraud was clearly erroneous. When we cast Sanders's complaint into "the liberal light in which we must take *pro se* pleadings," we are compelled to conclude that this mentally ill prisoner with no legal training, drafting his

complaint while housed in solitary confinement, may have "inartfully pleaded" his claims, but there is no basis to say that he has committed a fraud on the court.

His complaint tells a story of *inadequate* care. He details specific needs he has that are not being met. He relates interactions he has had with staff that seem to explicitly confirm that a certain degree of crisis is a prerequisite to obtaining necessary care. And the most unfortunate corroboration of all is his record of self-harm and attempted suicide.

Construing his complaint in this way, as we must, we are "left with a 'definite and firm conviction that a mistake has been committed.'" *See Brown v. Plata*, 563 U.S. 493, 513 (2011) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)) (explaining clear error standard). The district court's finding that the allegations were untrue was clearly erroneous.

This case is not like many of the other situations where we have found that a litigant has committed a fraud on the court in an effort to proceed IFP. A lot of those cases are clear-cut. Either there is documentary proof that "the allegation of poverty is untrue," *see, e.g.*, *Childress v. Kerr*, 803 F. App'x 949, 950–51 (7th Cir. 2020) (unpublished) (receipts and IFP revocation in another court proved litigant had not updated court on changed financial status); *Hughes v. Anderson*, 829 F. App'x 724, 724 (7th Cir. 2020) (unpublished) (jail calls with brother demonstrated explicit scheme to avoid fees); *Kennedy v. Huibregtse*, 831 F.3d 441, 443 (7th Cir. 2016) (pretrial discovery uncovered undeclared trust fund with $1,400 balance); *O'Connor v. Chi. Bd. of Educ.*, 790 F. App'x 801, 802 (7th Cir. 2019) (unpublished) (litigant admitted under oath to inaccuracies in financial affidavit); *Shuhaiber v. Illinois*, 747 F. App'x 428, 428

(7th Cir. 2019) (unpublished) (litigant admitted to forging signature of jail's trust fund officer), or that the litigant misrepresented his litigation history, *see Hoskins*, 633 F.3d at 543 (court records showed three pending cases omitted from IFP application). Not so here.

Viewed in the proper light, the documentary evidence here—100 pages of mental health progress notes—does not refute the truth of Sanders's allegations. They show that he received *some* care, but many of the visits were only five or ten minutes long, and he indisputably received flurries of additional attention and care following self-harm. These facts corroborate the allegations as we have construed them above.

But let's suppose that the allegations were indisputably disproved by the progress notes, as the district court found. It was still clearly erroneous for the district court to conclude that that inaccuracy constituted a sanctionable lie. A court must find that a litigant acted intentionally, or "with a degree of culpability that exceeds simple inadvertence or mistake." *Ebmeyer*, 11 F.4th at 546 (quoting *Ramirez*, 845 F.3d at 776, 778). The conduct must be "an indication of bad faith or a willful abuse of the judicial process." *Id.* at 547. The record is devoid of anything showing this level of culpability.

The district court's finding on intent was consequently lacking. It held that Sanders's assertion "represents far more than inaccuracy. Plaintiff, a prolific litigator, was aware that he could not proceed IFP absent allegations of imminent danger of serious physical harm. It appears that Plaintiff made such unsupported allegations so as to circumvent the 3-strikes rule … . In so doing, he lied … ."

First, despite its view that Sanders is a "prolific litigator," the district court was nevertheless under an obligation to hold the allegations in his complaint "to less stringent standards than formal pleadings drafted by lawyers." *Hughes*, 449 U.S. at 9 (quoting *Haines*, 404 U.S. at 520). It appears to have done the opposite, justifying its approach by labeling Sanders a "prolific litigator."

And to say that his knowledge of the three-strikes rule and its exception means that his attempt to fit his claim within that exception is indicative of fraud is to hold his pleading to a *more* stringent standard than the court would hold an attorney's, for knowing the standard, the law, and the jurisdictional requirements, and ensuring a client's case survives scrutiny under those dictates, is ordinary legal practice.

There are a sufficient number of situations where an inmate with three strikes might know the three-strikes rule and still have a meritorious claim that truthfully demonstrates he is in imminent danger. For these reasons, the finding of intent was clearly erroneous.

*C. Lesser Sanctions*

District judges drawing on their inherent power to sanction fraud on the court are required to consider lesser sanctions before resorting to dismissal with prejudice. *See, e.g.*, *Rivera v. Drake*, 767 F.3d 685, 687 (7th Cir. 2014). But the bar is extraordinarily low. *See Hoskins*, 633 F.3d at 544 ("We view the court's citation of *Oliver* as demonstrating that it considered lesser sanctions.").

The Defendants argue that Sanders forfeited his argument that the district court's failure to consider lesser sanctions constitutes legal error by not raising it until after judgment, when

Sanders filed a Rule 59(e) motion. Sanders responds, correctly, that the court's legal error—not considering lesser sanctions—did not arise until the time of judgment, so he could not have raised the argument before then. *See Duran v. Town of Cicero*, 653 F.3d 632, 643 (7th Cir. 2011). Therefore, the issue is properly before us on appeal.

The district court never addressed lesser sanctions. And although the Defendants assert that "the appropriateness of lesser sanctions need not be explored if the circumstances justify imposition of the ultimate penalty—dismissal with prejudice," Appellees' Br. at 46 (citing *Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018)), that is not what the case law on IFP-related fraud-on-the-court dismissals says. What that case law says is that district judges must consider other sanctions before resorting to dismissal.

Indeed, the "need for the district court to exercise discretion in deciding among alternative sanctions [is] especially great" when the plaintiff is proceeding *pro se*. *Ebmeyer*, 11 F.4th at 547 (quoting *Schilling*, 805 F.2d at 277). It was an abuse of discretion for the district court to forego this assessment altogether. *See id.* at 540. But this conclusion is beside the point because sanctions were unwarranted to begin with—there was no fraud on the court.

Finally, because we primarily rest our decision on a finding that there was no fraud on the court, we have no need to reach a number of other arguments raised by the parties. We express no opinion on these unaddressed issues, saving their resolution for another day.

### III. Conclusion

Because we conclude that the district court's finding of fraud was clearly erroneous, and that its failure to consider lesser sanctions was an abuse of discretion, we REVERSE.